John T. JONES, Plaintiff,

v.

The UNITED STATES of America and Waterman Steamship Corporation, Defendants and Third-Party Plaintiffs,

v.

NACIREMA OPERATING COMPANY, Inc., and the United States of America, Third-Party Defendants.

Civ. A. No. 365–69–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

May 9, 1972.

Sidney H. Kelsey, Norfolk, Va., for plaintiff.

John W. Winston, Norfolk, Va., for Waterman Steamship Corp.

Anthony W. Gross, U. S. Dept. of Justice, Washington, D. C., for the United States.

William B. Eley, Norfolk, Va., for Nacirema Operating Co., Inc.

MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

The United States owns and operates Pier No. 4 at the Norfolk Naval Base. This pier is used as an assembly point for loading and unloading government cargo. The United States customarily provides its own labor, materials, equipment, and vessels in conducting the business of Pier No. 4. However, due to peak shipping periods, it becomes necessary for the United States to seek shipping and stevedoring aid from civilian concerns. On June 4, 1968, the SS JOHN B. WATERMAN, a cargo vessel owned by Waterman Steamship Corporation, was tied up at Pier No. 4 to be loaded with government cargo, pursuant to a contract between Waterman and the United States whereby Waterman would provide space on its vessels for government cargo. The United States had also contracted with Nacirema Operating Company to perform terminal and stevedoring services as required by the United States, and to provide all supervision, labor, gear, and equipment necessary for that purpose. Among other things, Nacirema was to tier and untier the goods, transport same from the storage area to the ship's side, and load and stow them in the vessel.

The plaintiff, John T. Jones, was employed as a longshoreman for Nacirema in a gang led by Rufus Johnson. The gang commenced loading the SS JOHN B. WATERMAN around 7:00 p. m. on June 4. The first chore was to rig the ship. This process required the longshoremen to take stevedoring gear from the gear room and place it on the dock alongside the ship. The "save-all" (net) was unloaded, the cargo hook was secured to the ship, and the gear was "sighted." The longshoremen were then divided into a ship's gang and a dock gang. The ship's gang loaded the cargo from the pier into the vessel and stowed it into her holds. The dock gang transported the cargo from inside the shed at Pier No. 4 to an area on the pier alongside the SS JOHN B. WATERMAN.

The plaintiff was a member of the dock gang. His job confined him exclusively to the cargo shed, located on the pier approximately seventy-five feet from the side of the vessel. He was not required to go aboard the vessel at any time. The freight to be loaded was at rest in the shed. Some of the drafts were "unitized" or "palletized" into one unit secured on pallet boards by bands. Other miscellaneous articles of various sizes and shapes were resting on pallet boards in an unsecured fashion.

The operation in the cargo shed was as follows. A checker designated to the dock gang the drafts of freight to be loaded aboard the vessel. It was plaintiff's job to point out to the towmotor operators, as they entered the shed, which pallet board to pick up. The freight on some of the pallets was unstable, and Jones was required to secure these freight pallets before the towmotors lifted them from the various stacks where they were stowed. After these pallets of goods were taken by the towmotors, Jones would place a band around the freight or merely straighten the freight on the pallets, depending upon the stability of the load, to insure that the pallets could be safely carried by the towmotors. The drafts of freight were then transported by the towmotors to the side of the ship to be loaded aboard the SS JOHN B. WATERMAN by the ship's gang.

The alleged accident occurred at approximately 9:30 p. m. in the aforesaid cargo shed. Nacirema's towmotors had already removed a substantial number of drafts from that shed. Three pallets, referred to herein for identification purposes as numbers 1, 2 and 3, remained. Pallets Nos. 2 and 3 rested on the floor adjacent to each other, with pallet No. 3

forward of pallet No. 2. Although there was some evidence to the contrary, we believe that pallet No. 1 was on top of pallet No. 3. The plaintiff had surmised that pallet No. 1 was also supported by pallet No. 2. However, it is evident from his testimony that this is purely speculative. Furthermore, we feel that the exact position of pallet No. 1 is an inconsequential fact to the disposition of this case.

Each of these three pallets was made up of loose, unsecured freight, including five gallon and one gallon buckets of an unidentified liquid. The plaintiff had not banded these pallets, or touched them in any way. A towmotor came into the shed to pick up one of the remaining pallets. Jones glanced at the stack to insure that they were fit to be transported, and then directed one of the towmotors to pick up pallet No. 3. He banded the pallet, and the towmotor proceeded out of the shed with this loaded pallet. In the meantime, Jones turned his back to the two remaining pallets, awaiting the arrival of the second towmotor. He heard a cracking noise, which was pallet No. 1 giving way. Jones was unable to avoid two buckets of liquid which fell from the pallet. One bucket struck and injured his left ankle and foot. A chronic synovitis developed.

In January 1970, Jones underwent surgery to relieve the pain and swelling he was experiencing due to this injury. It was the opinion of his physician, Dr. W. Clarke Pole, that Jones would recover, although recovery would be a slow process involving a year or more.

On the above set of facts, the plaintiff, a Virginia resident, filed an action in this court, based on diversity of citizenship and the amount in controversy, against Waterman Steamship Corporation, alleging the unseaworthiness of the SS JOHN B. WATERMAN. The plaintiff also filed an action against the United States of America, pursuant to the Suits in Admiralty Act and the Public Vessels Act, alleging that the United States was negligent in providing a defective pallet which caused the plaintiff's injuries. Waterman filed a third-party complaint against the United States and Nacirema Operating Company for indemnity in the event Waterman was held liable to Jones. The United States filed a cross-claim against Nacirema in the event the United States was held to be negligent.

We will first consider the plaintiff's claim against Waterman. This contention raises the issue of whether Jones can invoke the maritime jurisdiction of the United States District Court on the above set of facts. This question has been answered by the recent Supreme Court decision in Victory Carriers, Inc. v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971). Law was a longshoreman employed by an independent stevedoring company to operate a forklift owned by his stevedore employer. He was assisting in loading a ship, tied up at a pier, by driving cargo from a pickup point to a point on the pier alongside the vessel. The cargo was then hoisted aboard by the ship's own gear. The overhead protection rack of the forklift fell on Law while he was engaged in this operation. He brought an action against the ship alleging unseaworthiness and negligence. The unseaworthiness claim became crucial. The threshold issue decided was whether martime law governs accidents suffered by a longshoreman who is injured on the dock by defective equipment owned and operated by his stevedore employer. The court held that federal maritime law, including the doctrine of unseaworthiness, does not govern pierside accidents caused by a stevedore's pier-based equipment. In arriving at this decision, the Supreme Court noted that, in this case, " * * * the typical elements of a maritime cause of action are particularly attenuated: respondent Law was not injured by equipment which was part of the ship's usual gear or which was stored on board, the equipment which injured him was in no way attached to the ship, the fork lift was not under the control of the ship or its

crew, and the accident did not occur aboard ship or on the gangplank." 404 U.S. at 213–214, 92 S.Ct. at 426.

We feel that the decision in Victory Carriers, Inc. v. Law, *supra*, is controlling on the set of facts at hand, which coincide exactly with the above-recited four-pronged test applied by the Supreme Court in arriving at that decision. First, Jones was not injured by equipment which was part of the ship's usual gear or which was stored on board. He was injured by a defective pallet that, according to the testimony, was to be used only to facilitate transporting the loose buckets and barrels of liquid into the ship's hold. The pallet, if used in this capacity, would not have remained with the vessel during the voyage. As soon as the cargo was loaded, the pallet was to have been returned to a storage shed on the pier. The pallet was not to be stored on board or be used in any way as part of the ship's gear.

Secondly, the pallet, like the towmotor in *Victory Carriers* was in no way attached to the ship. It remained in the cargo shed where it had been stowed some days before the loading process began. Thirdly, the pallet in question was not under the control of the ship or its crew. The loading process was organized such that Nacirema was in charge of transporting the pallets from the cargo shed to the ship's side. The ship and its crew never handled the pallet, since they did not exercise control over the cargo until it came on board the vessel. This particular pallet at all times remained in the cargo shed. Finally, the accident occurred in the cargo shed some seventy-five feet from the ship's side, and not on board the ship or the gangplank. As the court in *Victory Carriers* noted: "The gangplank has served as a rough dividing line between the state and maritime regimes." 404 U.S. at 207, 92 S.Ct. at 422.

Based on this step-by-step comparison, it is evident that the holding of Victory Carriers, Inc. v. Law, *supra*, is in point with the facts at hand. We hold that the plaintiff's pierside accident caused by pierbased equipment, does not come within the maritime jurisdiction of this court. Therefore Jones cannot avail himself of the warranty of seaworthiness extended by a shipowner in maritime accidents.

The plaintiff asserts that *Victory Carriers* is *ad hoc* in nature, deciding a very narrow issue applicable only to the exact facts therein involved, and having no relevancy to the case at hand. This is because, as the plaintiff contends, the defective cargo pallet was part of the ship's equipment. We do not accept this contention. As explained above, the defective pallet was never a part of, nor was it ever intended to be a part of, the ship's equipment. The plaintiff states in his memorandum that the pallet " * * * was placed into the vessel's hold and went with the ship." It is clear from the evidence that this is not accurate. The apparent defective pallet that injured Jones never left the cargo shed and was never intended to be *stored* on board the ship. This is one of the reasons that *Victory Carriers* is applicable to our case.

The plaintiff relies upon Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963) and United States Lines Co. v. King, 363 F. 2d 658 (4 Cir., 1966) for the proposition that maritime jurisdiction covers the case at bar. In *Gutierrez* the petitioner, a longshoreman, slipped on some loose beans spilled on the dock while unloading a cargo of packed beans from a vessel. The beans were stowed at the beginning of the voyage in broken and defective bags. The court, in holding the cargo containers to be unseaworthy, stated that, "When the shipowner accepts cargo in a faulty container or allows the container to become faulty, he assumes the responsibility for injury that this may cause to seamen or their substitutes on or about the ship." 373 U.S. at 213–214, 83 S.Ct. at 1190. This language distinguishes *Gutierrez* from the facts at hand. In *Gutierrez* the defective bean bags had been accepted by the vessel when they were loaded into the hold.

At this point, the warranty of seaworthiness attached to them. The accident happened sometime later, after the voyage was complete and the beans were being unloaded. In the instant case, the vessel had never accepted the cargo on the faulty pallet. At the time the pallet gave way, it was still in the warehouse on Pier No. 4. Other pallets had been moved from the warehouse to the ship's side, however the particular pallet in question had not been touched by the shipowner or the stevedoring company. It had merely been designated as a pallet to be loaded aboard the vessel for the purpose of carrying the buckets of liquid, and thereafter to be removed from the vessel. We do not feel that the act of designating cargo resting in a warehouse to be loaded onto a vessel, standing alone, is enough to warrant a finding that a vessel has accepted that cargo. Since the pallet in question had never been accepted by the vessel, the warranty of seaworthiness did not include the pallet. Gutierrez v. Waterman S.S. Corp., *supra.*

In United States Lines Co. v. King, 363 F.2d 658 (4 Cir., 1966), King, a longshoreman, was injured aboard a vessel taking on cargo. A forklift stopped on the deck of the vessel to lower some bundles of lumber, bound by metal bands, into the hatch of one of the ship's holds. As the load was elevated to a point of stowage, the band across the upper bundle broke. Pieces of lumber fell from the forklift and injured King. The Fourth Circuit Court of Appeals held that when bands are utilized by the ship as an instrument for loading, the warranty of seaworthiness attaches to them. If the bands serve as containers, their security is likewise vouched.

The *King* case is clearly distinguishable from the facts here presented in the same manner that the court in *Victory*

*Carriers* distinguished Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). *King* did not deal with the question of the extent of federal admiralty and maritime jurisdiction, since the accident there occurred on board the vessel. The issue decided was the legal and factual question of whether the metal bands were cargo containers so that the doctrine of seaworthiness would attach.

The plaintiff is left with the assertion that the doctrine of seaworthiness attaches to an injury sustained on land merely because the injured longshoreman was engaged in the process of loading or unloading; an assertion denied by Victory Carriers, Inc. v. Law and Nacirema Operating Co. v. Johnson, 396 U. S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969).[1]

For the reasons stated above, we hold that the boundaries of maritime law, including the doctrine of seaworthiness, do not extend to cover the above set of facts. Consequently, there is no basis for recovery from Waterman founded in the warranty of seaworthiness.

The plaintiff's claim against the United States is based upon negligence in providing a defective pallet which caused him injuries. The plaintiff established through his own testimony and the testimony of a fellow stevedore, William Hudson, that the pallet broke causing two buckets to strike and injure him. It can be assumed, arguendo, that the pallet was defective. However, the record does not show why the pallet gave way. Jones testified that the pallet broke because it was made of pine, a weak wood in his estimation. Notwithstanding this fact, which incidentally was not proven, there was no evidence offered which showed negligent conduct on the part of the government in providing the pallet in question or, we might add,

---

1. Plaintiff also relies upon Tucker v. Calmar Steamship Corporation, 457 F.2d 440, decided March 17, 1972 (4 Cir., 1972). In *Tucker*, there was a physical connection between the vessel and the gear which gave rise to the accident. The case is inapposite. Moreover, in the recent case of Snydor v. Villain & Fassio (and related cases), 459 F.2d 365, decided by the Fourth Circuit on April 24, 1972, the issue seems to have been put to rest.

on the part of Nacirema in handling the cargo. The only facts that this court has before it concerning the pallet are that it was owned by the United States and that it broke, thereby causing injury to Jones.

The principles of law which govern in this case have been long established:

"Negligence cannot be presumed from the mere happening of an accident. The burden is on the plaintiff who alleges negligence to produce evidence of preponderating weight from which the jury can find that the defendant was guilty of negligence which was a proximate cause of the accident. The evidence produced must prove more than a probability of negligence and any inferences therefrom must be based on facts, not on presumptions. It is incumbent on the plaintiff who alleges negligence to show why and how the accident happened, and if that is left to conjecture, guess or random judgment, he cannot recover." .Weddle, Administratrix v. Draper, 204 Va. 319, 332, 130 S.E.2d 462, 465 (1963).

Jones has not proven that the United States was negligent in any manner in providing the pallet, or that it breached any duty it might owe him. The United States owned the pallet, but there is no showing that it was manufactured by an agency of the government. Consequently we deny recovery to the plaintiff based on negligence of the United States.

■ We turn now to the issue of indemnification for attorneys' fees and expenses. The United States bases its claim against Nacirema on breach of contract and warranties. In the contract, the stevedore expressly undertook to indemnify the United States for injuries caused in whole or in part by the negligence of the stevedore. An exception to this broad liability, embodied in an "exculpatory clause," precludes indemnity where an accident is caused by the unseaworthiness of the vessel or the failure or defect in equipment furnished by the United States, and the stevedore "by the exercise of due diligence" could not have discovered the defect or "otherwise have avoided" the accident or injury.[2]

The immediate cause of the harm was not the default of Nacirema but a defect in the pallet owned by the Government. Because the stevedore was not negligent and at all times performed its contractual obligation to exercise "due diligence," the exculpatory clause in the contract proscribes the Government's indemnity claim based on this contract.

■ The Government submits that Nacirema's warranties of workmanlike performance, expressed and implied, control its indemnity action against Nacirema. We do not agree. As previously mentioned, Nacirema at all times exercised due care under the circumstances. This is all that any implied warranty would require. Nacirema, or any stevedore, cannot be put in the position of an insurer as to the Government in the absence of an express contract embodying such liability. Therefore, any indemnity claim that the Government may assert against Nacirema based upon expressed or implied warranties is denied.

■ Waterman enters an indemnity claim against the United States. It is

---

2. The contract between the United States and Nacirema is as follows:
"Clause 21. Liability and Insurance. "b. The Contractor shall not be responsible to the Government for and does not agree to hold the Government harmless from loss or damage to property or bodily injury to or death of persons if:
(1) The unseaworthiness of the vessel or failure or defect of the gear or equipment furnished by the Government contributed jointly with the fault or negligence of the Contractor in causing such damage, injury or death, and the Contractor, his ofifcers, agents, and employees, by the exercise of due diligence, could not have discovered such * * * defect of gear or equipment, or through the exercise of due diligence could not otherwise have avoided such damage, injury, or death."

founded in a contract between the parties whereby Waterman would provide vessel space for Government cargo. The United States was responsible for loading as well as the palletizing, drayage, storage and warehousing of the cargo. Waterman asserts that this undertaking implied that such services would be performed with reasonable safety. Thus, if the pallet broke without cause, then the United States necessarily breached its contract. We cannot accept this argument. As was the case with Nacirema above, the United States is not an insurer of the pallets. There is no evidence to indicate that the Government performed its obligation other than with reasonable safety. Therefore Waterman's indemnity claim against the United States is denied.

■ Waterman also enters an indemnity claim against Nacirema based upon the plaintiff's alleged substandard performance of the warehouse work to which he was assigned. There is no evidence to indicate that the plaintiff acted in an unreasonable manner. Unfortunately he just happened to be in the wrong place at the wrong time. We do not feel that this alone is enough to impose an indemnity claim against Nacirema; therefore, Waterman's claim based on this theory is denied.