**UNITED STATES of America,**
**Plaintiff,**

v.

**NORTHERN METAL COMPANY,**
**Defendant.**

**No. 109 of 1965.**

United States District Court,
E. D. Pennsylvania.

June 28, 1974.

Anthony W. Gross, Admiralty & Shipping Sect., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

John B. Brumbelow, Philadelphia, Pa., for defendant.

## DECISION AND ORDER

DITTER, District Judge.

This is a suit brought by a ship owner seeking indemnification from a stevedore for damages resulting from the death of a longshoreman injured during loading operations. Two issues are involved: the seaworthiness of the vessel and the interpretation of a contract between the parties.

On May 1, 1959, Albert Mascuilli was killed while working aboard the USNS MARINE FIDDLER in the port of Philadelphia. Suit was brought by his administratrix pursuant to the Public Vessels Act, 46 U.S.C. §§ 781–790, alleging the unseaworthiness of the MARINE FIDDLER and the negligence of the Government as owner.[1] That matter

---

1. Helen Mascuilli v. U. S., No. 203 of 1959. There have been five adjudications by this Court, four by the Court of Appeals, and one by the Supreme Court of the United States.

was tried by the Honorable Ralph C. Body, late of this Court. Judge Body held that the accident in which Mascuilli was killed was not proximately caused by an unseaworthy condition or by the negligence of the Government as vessel owner. Although his decision was affirmed by the Court of Appeals, it was reversed by the Supreme Court in a short per curiam opinion.[2] In the instant case, the parties have entered into a stipulation of facts and have agreed that I may consider the evidence submitted to Judge Body in the *Mascuilli* case.

Based on the Supreme Court's decision in *Mascuilli* and the stipulation between the parties, I make the following:

## FINDINGS OF FACT

1. The USNS MARINE FIDDLER was a public vessel operated by plaintiff, United States, through its agency, the Military Sea Transportation Service (MSTS), United States Navy.[3]

2. The vessel was built at Sun Shipyard in Chester, Pennsylvania, in August, 1945, and converted into a heavy lift cargo vessel in April, 1954, with changes in her structure, mast, booms and other equipment at No. 3 and No. 4 hatches, in order to handle extremely heavy cargo weighing up to 150 tons. These changes rendered the USNS MARINE FIDDLER one of the few vessels afloat with such heavy cargo handling capabilities which resulted in her entire loading system and equipment being unique and more complicated than the normal cargo vessel.

3. On May 1, 1959, the said vessel was moored, port side to, at one of the docks of defendant, Northern Metal Company, upon the navigable waters of the Delaware River in the Port of Philadelphia to take on a cargo of M103A1 Army tanks, each weighing in excess of 64¼ tons.

4. Defendant, Northern Metal Company, an independent expert stevedore contractor, was engaged by the Government to handle Government cargoes in the Port of Philadelphia. The contract between the parties contained the customary provisions requiring the expert stevedore contractor to handle fully the loading and stowing of cargo aboard the said vessel.

5. All the cargo handling gear and equipment at the No. 3 hatch of the USNS MARINE FIDDLER was furnished by the Government and had been rigged by members of the crew of the vessel prior to the commencement of cargo operations on May 1, 1959. The principal part of the gear consisted of a 150-ton swinging jumbo boom.

6. The jumbo boom was raised and lowered in a vertical plane by means of a topping lift and was swung inshore and offshore by the vangs attached to the flounder of the cargo pendant. Each of the vangs was operated by its own independent winch. However, the winches could not be operated simultaneously; that is, the boom could not be topped or lowered at the same time the hoisting gear was being raised or lowered, and vice versa. The winches for the vangs were located on deck. The controls for the port and starboard after vangs were upon an elevated platform on the after port end of the hatch and were operated by a single operator. The forward starboard vang control was on an elevated platform at the forward end of the hatch and was operated by another winchman.

There are three other related cases arising from the same accident. Charles Mascuilli v. United States, No. 179 of 1959, Joseph Edwards v. United States, No. 229 of 1959, Stanley Maliszedwski v. United States, No. 231 of 1959. As a result another indemnity action was brought, United States v. Northern Metal Co., No. 111 of 1965. Since the legal issues are the same in both cases, the parties have agreed that the decision in this case shall be dispositive of the other.

2. Mascuilli v. United States, 241 F.Supp. 354 (E.D.Pa.1965), aff'd per curiam, 358 F.2d 133 (3d Cir. 1966), rev'd per curiam, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967).

3. MSTS is now called the Military Sealift Command.

7. The handling of the cargo and the operation and movement of the ship's heavy lift gear were performed entirely by Northern Metal employees under the supervision of a Northern Metal foreman.

8. When the longshoremen came aboard the vessel, they were questioned as to their familiarity with the vessel and her gear by the First Officer, Mr. Henry. The First Officer was informed by the longshoremen's foreman that they had operated this type of heavy lift gear and were quite able to handle these loading operations. Nevertheless, several experienced crewmen instructed the longshoremen in the operation of the heavy lift gear and the individual duties of the different winchmen. All winch controls operated in the conventional manner, and instructions for operating the same were posted beside the winches.

9. The First Officer, Mr. Henry, stood by throughout the day's operation to insure proper handling of the gear and proper operation of the winches. He advised and cautioned the foreman-signalman, Majdowski to be sure that the vang lines were not pulled too tight. He testified that he was satisfied that the longshoremen were capable of properly operating the gear and that otherwise he would not have permitted them to operate it.

10. To facilitate the loading of the M103A1 tanks, the 150-ton heavy lift boom at No. 3 hatch was rigged for port side loading; there were three vangs in use; two after vangs, port and starboard, located on each side of the boom and running to vang posts at the after end of the hatch, and an offshore vang at the forward starboard end of the hatch. These vangs are designed only to swing the boom and do not support the weight of the cargo. In swinging the boom outboard over the pier to pick up a tank, the after port vang is heaved in and the two offshore starboard vangs are slacked off. When the boom is at the desired horizontal angle over the pier, heaving is stopped on the port

vang and the vang is slacked. The boom is then lowered by other winches, as stated before, that activate the topping lift and hoisting gear. While the tank is attached to the hook and raised, the forward starboard vang is used to check the swing of the boom as the vessel takes a slight port or inshore list as the $61\frac{1}{4}$ ton tank is raised on the hook. When the tank is raised clear of the side of the vessel by hoisting and topping the boom, the forward starboard vang then pulls the tank toward the hatch since it is in the best position to perform this job being at right angles to the load. The after starboard vang is of no use initially in pulling the boom since its angle to the heel of the boom is too acute and would exert an undue strain of the boom. The after port vang must be kept slack constantly by additional paying out of the winch while the boom and tank are swung over the hatch. Thereafter, the port vang will not be used again unless it is necessary to check the swing of the boom and tank as they are positioned over the hatch.

11. At approximately 5:00 P.M., Mr. Henry left the deck, and was replaced by Third Officer Moore as deck officer to observe the loading operation. At this time, eight tanks had been successfully loaded by the longshoremen, indicating that they were capable and competent to operate the gear in a proper manner.

12. Five minutes after Mr. Moore was on deck, while Mr. Henry was eating supper, as the ninth tank was being lowered into hatch No. 3, the accident occurred when suddenly, without warning, the port shackle suddenly parted and the vang and connecting parts recoiled and dropped to the after port deck, striking and inflicting fatal injuries upon one of the longshoremen, Albert Mascuilli. The parting was accomplished with such force and release of energy that it was described as "thunder."

13. At no time during loading should the after port vang and the forward starboard vang become simultaneously taut and, since these vangs are posi-

tioned opposite one another, there is no practical reason for, or purpose served by causing both of these vangs to become simultaneously taut. The only feasible explanation for permitting these individual vangs to become simultaneously taut, also known as tightlining, would be inadvertence or inattention in the operation of the vang winches.

14. The principle of tightlining can best be illustrated by visualizing two lines supporting a weight where the angle between the lines is zero degrees and each line supports one-half of the weight in this position. As the angle between the two lines increases, the load that the weight exerts is increasingly multiplied, and when the lines are at a theoretical 180 degrees, or in a straight line, the multiplied load of the weight upon the two lines is infinite.

15. Once a tightline condition has been created, there are no known or designed safety precautions in marine architecture and engineering which will prevent the parting of the vangs and guys and their connecting parts.

16. In April 1959, less than one month prior to the accident, The American Bureau of Shipping witnessed and approved an annual inspection of the MARINE FIDDLER'S 150-ton heavy lift gear. The annual inspection required an examination of all moveable gear, wire, blocks and shackles. At the conclusion of this inspection the gear was certified as having successfully completed the annual inspection.

17. On April 30, 1959, the day prior to the accident, the 150-ton heavy lift gear at the No. 3 hatch was rigged by the crew of the vessel for portside loading; all running wires, blocks, booms and swivels were carefully greased and inspected. The port and starboard shackles attaching the vang spreaders to the flounder plate were also inspected by the First Officer and the Boatswain and were found to be in first class condition with no evidence of fatigue, no sign of wear, marks, notches, cracks or paint flakes on either shackle.

18. The port shackle which parted was shown by metallurgical tests, performed after the accident, to fully comply with Government specifications. Examination of the parted port shackle revealed that at the point of break there was no evidence of any notch, scars, scratches, defects, imperfections or wear. Furthermore, there was no evidence of any fatigue or abrupt change in the shackle body at the point of break.

19. The vangs were powered by electrical winches located on the deck at the corners of the hatch.

20. Each of the vang winches was equipped with electrical cut-offs with an instantaneous automatic trip at 550 amperes in the electric motor which was sealed by the manufacturer. The 550 ampere automatic cut-off setting results in an instantaneous trip and must be placed at that setting to allow initial surges of amperage to start the motor.

21. In addition, each of the vang winches was equipped with a branch circuit breaker with a 275 ampere cut-off. The 275 ampere setting will not trip instantaneously, rather its activation depends upon the amount of overloading and the extent of time of overloading.

22. The winches have eleven operating positions: neutral, five forward or paying-out positions and five after or heaving-in positions. When the winch cut-offs are tripped, the effect is to shut off the power immediately and to engage the automatic brake holding the line in its existing condition. When the winch is in neutral or stopped position, the cut-off will not trip because the winch will not be drawing any electric current.

23. Both the electric cut-off with an instantaneous trip at 550 amperes and the branch circuit breaker with a 275 ampere cut-off are fixed settings and these settings are necessary to allow the winch to perform its designed pull. The unrebutted expert testimony was that these settings were proper and sound for use in this rig.

24. When the winches are paying-out, the cut-off will not trip. When in a paying-out position, an excessive force is applied, the motor becomes a generator and the excessive current is thrown into resistors, giving the winch a brake effect. In this situation the cut-offs in the winch motor and circuit breaker will not be affected by the amperage and the cut-offs will not trip.

25. Winch cut-offs have no application in the instant case. First, the straight line pull of the winches at 30 tons is not sufficient to part the vangs or the vang shackles. Second, any winch cut-off only applies the winch brake; it does not slack off the vangs and hence, it would only preserve the tightline condition rather than relieve it. Third, there is no designed procedure in marine architecture and engineering which permits the cut-offs to be set in such a way as to prevent the parting of vangs or their connecting parts by tightlining. Fourth, since the testimony is that the after port winch was being payed-out, the after port winch could never experience any cut-off action.

26. Three or four times during the day the First Officer cautioned the longshoremen against tightlining. The longshoremen themselves demonstrated a knowledge of the danger of tightlining or pulling in opposite directions and were aware that this would cause the gear to break or part.

27. The vangs were leading upward at the time of the parting of the shackle. With the vangs leading upward, lowering of the tank would tend to increase the strain on the vangs. Moreover, the after starboard vang was being heaved in at a greater rate of speed than the other vangs were being payed-out. The tension on the vangs created by this unsafe procedure created a tightline effect. Furthermore, the tightline effect which existed between the after port vang and the forward starboard vang, and the heaving in of the after starboard vang, would have been greatly increased by a lowering of the tank, by a raising of the tank, or by a raising of the boom itself to a more advantageous position in the after quadrant of the hatch.

28. Mr. Moore, the Third Officer, was attentive throughout the entire loading procedure and was unable to prevent the tightline condition since *it occurred suddenly and without warning*. There was no time to issue any warnings or instructions to any of the winch operators or the signalman.

29. Since the electrical cut-offs on the winches were set at 275 and 550 amperes respectively so that the winch motors could be operated, and these settings were not subject to adjustment, the defendant, Northern Metal, could not have discovered the unseaworthy condition of the MARINE FIDDLER by exercising due diligence.

30. Furthermore, since the accident was created by the negligence of the longshoremen combining with the unseaworthy condition of the setting of the winch circuit breakers, and it occurred instantly and without warning, Northern Metal was unable to avoid injury by exercising due diligence once the tightline condition was created.

31. Under its contract with the Government (Master Contract No. DA–30–182–400–TC–1212), defendant, Northern Metal Company, agreed to perform all stevedoring, terminal and related services in a "proper and efficient" manner. The contract also provided:

> *Safety and Policing*—The Contractor shall, in performing services on the vessels, piers and areas under his control, observe all required safety and other applicable regulations, all other commercial marine safety practices; and take all necessary and proper fire precautions . . . . (Clause 1, Item 1 s.)

> Workmanship and Inspection—All workmanship, materials and equipment furnished by the Contractor and used in the performance of work hereunder shall be in conformance with the best commercial practices. Any damages resulting from the Contractor's negligence in observing proper safety or

fire prevention rules, shall be chargeable to him. . . . (Clause 1, Item 1 t.)

32. Clause 12 of the Contract provided in pertinent part:

CLAUSE 12. *Liability and Insurance.*

a. The Contractor

(1) shall be liable to the Government for any and all loss of or damage to cargo, vessels, piers, or any other property of every kind and description, and

(2) shall be responsible for and shall hold the Government harmless from any and all loss, damage, liability and expense for cargo, vessels, piers, or any other property of every kind and description, whether or not owned by the Government, or bodily injury to or death of persons occasioned either in whole or in part by the negligence or fault of the Contractor, his officers, agents, or employees in the performance of work under this contract. The general liability and responsibility of the Contractor under this Clause are subject only to the following specific limitations.

b The Contractor shall not be responsible to the Government for and does not agree to hold the Government harmless from loss or damage to property or bodily injury to or death of persons:

(1) If the unseaworthiness of the vessel or failure or defect of the gear or equipment furnished by the Government contributed jointly with the fault or negligence of the Contractor in causing such damage, injury or death, and the Contractor, its officers, agents, and employees, by the exercise of due diligence, could not have discovered such unseaworthiness or defect of gear or equipment, or through the exercise of due diligence could not otherwise

have avoided such damage, injury, or death.

## DISCUSSION

Three basic questions are presented for consideration in this case:

(1) Was the death of Albert Mascuilli caused by an unseaworthy condition aboard the MARINE FIDDLER?

(2) If such a condition existed, does the contract between the parties require the stevedore to indemnify the owner?

(3) In spite of the contract's express provisions, is there an implied warranty of workmanlike performance which requires the stevedore to indemnify the owner?

The Government urges the court to find that the MARINE FIDDLER was seaworthy at all times, the accident was caused solely by the negligence of the stevedore, and the Government is entitled to indemnification for whatever amount is recovered in the *Mascuilli* case. There is only one problem with the Government's contention: the Supreme Court has already ruled that the MARINE FIDDLER was unseaworthy, as a brief review of the history of the *Mascuilli* case indicates.

After a thorough analysis, Judge Body, trying the issues without a jury, held,

[T]he vessel and all its equipment was in a seaworthy condition at all times, and remained so throughout the entire loading operations. The accident was caused solely by the negligent operation of the stevedoring crew using seaworthy equipment in such a manner as to cause the accident to occur so instantaneously that the Third Officer was unable to warn anyone or prevent its happening.[4]

Judge Body determined that the accident resulted from a tightline, that is, the opposing pull from two winches on lines attached to a boom. As a result, a heavy shackle fastened to one of the lines parted and struck Mascuilli. Judge

---

4. Mascuilli v. United States, 241 F.Supp. 354, 362 (E.D.Pa.1965).

Body observed that once a tightline condition is created,

> there are no known or designed safety precautions in marine architecture and engineering which will prevent the parting of vangs or guys and their connecting parts. Consequently, only careful and attentive operation of the equipment by the winchmen could prevent such a situation from occurring.[5]

Judge Body decided that the winch cut-offs (circuit breakers) had no bearing on this accident. The controls of both the winches involved were set in a position where the cut-offs could not be tripped. He further found that the accident was caused by a failure of the longshoremen who were operating the vessel's winches to comply with proper loading procedures and thus they were not "equal in disposition and seamanship to the ordinary men in the calling."

The Court of Appeals affirmed in a per curiam opinion which stated:

> [T]he findings of fact by the trial court that the vessel and its equipment were in a seaworthy condition at all times throughout the loading operations and that the accident was caused solely by the negligent operation of the stevedore crew . . . are not clearly erroneous.[6]

The Supreme Court reversed in a cryptic per curiam opinion:

> The petition for a writ of certiorari is granted and the judgment is reversed. Mahnich v. Southern S. S. Co., 321 U. S. 96, 64 S.Ct. 455, 88 L.Ed. 561; Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L. Ed.2d 413.[7]

In interpreting *Mascuilli,* the circuit courts divided over whether unseawor-

thiness had been expanded to encompass instantaneous operational negligence.[8] This conflict was resolved when the Supreme Court clarified the *Mascuilli* decision in Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 500 n. 19, 91 S.Ct. 514, 518 n. 19, 27 L.Ed.2d 562 (1971), stating,

> The petitioner's reliance upon our summary *per curiam* reversal of a judgment for the shipowner in Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743, is misplaced. There a longshoreman had been killed during a loading operation aboard a Government vessel when under the strain of the opposing pull of two winches, a heavy shackle parted, recoiled, and struck him. The petition for certiorari posed three questions.
>
> (1) Did a prior unseaworthy condition come into play by the tightline condition?
>
> (2) Did the negligent handling of proper equipment by the longshoreman create a dangerous condition rendering the vessel unseaworthy?
>
> (3) Was the vessel unseaworthy because the longshoremen were not 'equal in disposition and seamanship to the ordinary men in the calling' as was found in Boudoin v. Lykes Bros. S. C. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354?
>
> Our *per curiam* reversal cited two cases: Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, and Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 455, 3 L.Ed.2d 413. *Mahnich* involved a defective rope, *Crumady* a defective winch. It seems evident, therefore, that it was the first question posed by the peti-

---

5. *Id.* at 358–359.

6. Mascuilli v. United States, 358 F.2d 133 (3d Cir. 1966).

7. Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967).

8. While there may have been disagreement over the interpretation of *Mascuilli,* one circuit court agreed that there was no basis in

logic or common sense for this extension of unseaworthiness. Tarabocchia v. Zim Israel Navigation Co., 417 F.2d 476, 478 (2d Cir. 1969), cert. denied, 405 U.S. 934, 92 S.Ct. 954, 30 L.Ed.2d 810 (1972) ; Candiano v. Moore-McCormack Lines, Inc., 382 F.2d 961, 962, rehearing denied, 386 F.2d 444 (2d Cir. 1967), cert. denied, 390 U.S. 1027, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968).

tion for certiorari to which the Court gave an affirmative answer.

*Crumady* involved the circuit breaker of a winch which was negligently set at twice the safe working load. When the stevedore crew negligently operated the equipment and created a load stress in excess of the safe weight, the circuit breaker failed to shut off the winch and the boom fell injuring a longshoreman.

While there are similarities between *Crumady* and *Mascuilli*, I believe there are very important differences. In *Crumady*, the experts testified that the circuit breaker setting was unsafe. In *Mascuilli*, however, the testimony showed that the circuit breakers were necessarily set at cut-off higher than the safe level in order to allow an initial electrical surge needed to start the motor. If the cut-offs had been set at the safe level, the motor could not have operated.[9] In addition, unrebutted testimony stated that the settings were proper for the use of this particular equipment and that there was no known procedure or device in marine engineering by which the cut-offs could be set to prevent a tightline condition.[10]

■ After examining the evidence, I would agree with Judge Body and the Court of Appeals that the MARINE FIDDLER was at all times seaworthy. However, I can find nothing in the Constitution, statutes, or recorded cases which would allow me to overrule the Supreme Court and declare the MARINE FIDDLER was seaworthy after all. Despite the evidence and the logic of Judge Body's conclusions, I am bound by the Court's decision in *Mascuilli* and *Usner* and conclude that the accident was caused by a prior unseaworthy condition which was brought into play by the negligence of the longshoremen.

The second question the Court faces is whether the Government should be indemnified under the express terms of the stevedoring contract. The defendant denies liability by reason of the exculpa-

tory language which the agreement contains. In relevant portions it provides:

CLAUSE 12. *Liability and Insurance.*
a. The Contractor

(1) shall be liable to the Government . . . and

(2) shall be responsible for and shall hold the Government harmless from any and all loss, damage, liability and expense for . . . bodily injury to or death of persons occasioned either in whole or in part by the negligence or fault of the Contractor, his officers, agents, or employees in the performance of work under this contract. The general liability and responsibility of the Contractor under this Clause are subject only to the following specific limitations.

b. The Contractor shall not be responsible to the Government for and does not agree to hold the Government harmless from . . . bodily injury to or death of persons:

(1) If the unseaworthiness of the vessel or failure or defect of the gear or equipment furnished by the Government contributed jointly with the fault or negligence of the Contractor in causing . . . injury or death, and the Contractor, its officers, agents, and employees, by the exercise of due diligence, could not have discovered such unseaworthiness or defect of gear or equipment, or through the exercise of due diligence could not otherwise have avoided such damage, injury, or death.

■ I interpret this paragraph to mean that if the unseaworthiness of the vessel and the negligence of the contractor acting together have caused injury or death, the stevedore is not liable unless by exercising due diligence it could have discovered the unseaworthiness or, in some other way could have prevented the injury. This provision plainly applies since the vessel was unseaworthy

9. N.T. 912–13, 917–21, 931–32.

10. N.T. 911–12, 924.

and the stevedore was admittedly negligent.

■ The absence of an adequate safety device which constituted the unseaworthiness of the vessel was unknown by the stevedore and was not of a type that could have been discovered by the exercise of due diligence. The only safety devices were two circuit breakers, or cut-offs for each winch. Neither could prevent a tightline accident and neither was ever set or adjusted, even by members of the ship's crew. In fact, one of the circuit breakers was set and sealed by the equipment's manufacturer.[11] Thus, the first exception to the exculpatory clause is not applicable.

The second limitation, the "otherwise" clause, contemplates negligence on the part of the stevedore, but an opportunity thereafter to prevent injury by the exercise of due diligence. If the stevedore fails to act with due diligence, it becomes liable for indemnification. However, this second exception is not applicable because there was no opportunity for Northern Metal to exercise any degree of diligence which would have prevented the injury to Mascuilli from which he died. Once the excessive strain was negligently placed upon the gear, there was no known way to prevent the gear from parting. The tightline occurred instantaneously; nobody was able to sound a warning or to prevent the accident. *Accord*: United States v. Harrison, 245 F.2d 911, 916 (9th Cir. 1957). See Jones v. United States, 342 F.Supp. 392, 398 (E.D.Va.1972).

The Government cites three cases involving the indemnity clause before us, all of which support my interpretation. In Smith v. United States, 336 F.2d 165 (4th Cir. 1964), the ship was held unseaworthy because a ladder had less than the minimum toe clearance. The Government was awarded indemnifica-

tion bcause the stevedore had *actual* notice of the dangerous condition and did nothing to provide its longshoremen with an alternative means of climbing between decks. The Second Circuit, in Shenker v. United States, 322 F.2d 622 (2d Cir. 1963), cert. denied sub nom. American Stevedores, Inc. v. Shenker, 376 U.S. 907, 84 S.Ct. 659, 11 L.Ed.2d 606 (1964), declared a ship unseaworthy when a stevedore timekeeper stubbed his toe on some loose dunnage on the deck and fell. In granting indemnification to the Government, the Court found that the stevedore could have discovered and corrected the unseaworthy condition. Finally in Santomarco v. United States, 277 F.2d 255 (2d Cir.), cert. denied sub nom. American Stevedore, Inc. v. United States, 364 U.S. 823, 81 S.Ct. 59, 5 L. Ed.2d 52 (1960), the ship was found unseaworthy and the stevedore held liable for indemnification when oil leaked on the deck from a defective winch. Judge Learned Hand stated that the stevedore could have avoided the accident by exercising due diligence in wiping up the oil.

In all three cases, the stevedore had or should have had actual notice of the unseaworthy condition and could have prevented the accident by exercising due diligence. On the MARINE FIDDLER, Northern Metal had no notice of the unseaworthy condition and no reasonable means to learn of it. Once this unseaworthiness and the negligent winch operation contributed jointly to create the tightline, there was no way that due diligence could have prevented Mascuilli's death because the rig parted instantaneously. Under this clause, the Government would only be entitled to indemnification if despite the combination of the vessel's unseaworthiness and the stevedore's negligence, the stevedore could have thereafter by the exercise of due diligence avoided the accident. It follows that since neither limitation to the exculpatory language applies, the

---

11. Mascuilli v. United States, 241 F.Supp. 354, 360 (E.D.Pa.1965). The stevedore is required to exercise only due diligence that a reasonable person would under the circum-

stances. IIe is not held to a higher standard. See United States v. IIarrison, 245 F. 2d 911, 915–917 (9th Cir. 1957).

Government is not entitled to indemnification under provisions of the contract.

Finally, the Government contends the stevedore is liable for indemnification on an implied warranty of workmanlike performance, a warranty which was breached when the tightline was created by the negligent operation of the winches.

■ An implied warranty for workmanlike performance does arise out of a stevedoring contract. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964); Williams v. Ocean Transport Lines, Inc., 425 F.2d 1183, 1186–1187 (3d Cir. 1970). The Government contends it is entitled to the benefit of this implied warranty unless it is expressly negated in the written contract.

While there are some cases that directly support the Government's contention, e. g., Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 336 F.2d 124, 127 (9th Cir. 1964), cert. denied, 379 U.S. 973, 85 S.Ct. 668, 13 L. Ed.2d 565 (1965); States S.S. Co. v. Portland Stevedoring Co., 216 F.Supp. 934 (D.Or.1963), I conclude they are not controlling in this case. First, none of them deal with the specific indemnity clause which is before me. This provision is part of a Government form that has constituted the basic agreement between the United States and countless stevedores. Since the Government is the largest employer of stevedores in the country, it would seem that hundreds of indemnification cases must have been litigated but none has been cited interpreting this clause as giving rise to a recovery on an implied warranty theory.

Second, I find that the express terms of the contract preclude implied terms on the same subject matter. The indemnification clause encompasses the full liability of the stevedore for its negligence. The provision is one for general liability, subject to specific limitations. Under certain circumstances described by the contract, the stevedore must indemnify the vessel-owner; under others, no indemnification is required. If the factual situation is one in which the parties have expressly agreed there be no liability, a court should not amend their understanding to provide relief that was bargained away. This interpretation is supported by many authorities.[12] In Shenker v. United States, supra, 322 F.2d at 629, a case which did deal with this same indemnity clause, Justice Thurgood Marshall, (then Circuit Judge) stated, "The existence of the express warranty makes it unnecessary for us to consider or rely upon principles of implied warranty." See also D'Agosta v. Royal Netherlands S. S. Co., 301 F.2d 105, 107 (2d Cir. 1962); Evans v. McDermott, Inc., 342 F.Supp. 1390, 1393 (E.D.La.1972); Roselli v. Shell Oil Co., 293 F.Supp. 1395, 1397 (E.D.La.1968).

Third, I believe those cases which require an express disclaimer of the warranty of workmanlike performance can be explained quite simply. Most of them deal with a situation in which there was an express indemnity clause, but, unlike the present case, one that did not cover bodily injuries. The stevedores in attempting to evade liability for damages caused by their negligence argued in these cases that the failure to include the specific words "personal injury" in the indemnification clause acted to negate expressly any implied warranty for such damages. The courts uniformly rejected the stevedores' reasoning and held that relief from liability for indemnification under an implied

12. M. Norris, The Law of Maritime Personal Injuries § 62, at 153–54 (2d ed. 1966); Stover, Longshoreman-Shipowner-Stevedore: The Circle of Liability, 61 Mich.L.Rev. 539, 558 (1963); Comment, Ryan Doctrine: Present Stature and Future Development, 37 Tul.L.Rev. 786, 790 (1963).

warranty must be clearly and unequivocally expressed. Pettus v. Grace Line, Inc., 305 F.2d 151 (2d Cir. 1962); Caputo v. Kheel, 291 F.Supp. 804, 808 (S.D.N.Y.1968); DiVittorio v. Skiles A/S Siljestad, 244 F.Supp. 48, 50 (S.D.N.Y. 1965). These decisions are inapposite to the case at bar.

Finding no Third Circuit case to the contrary, I conclude the Government cannot recover for breach of an implied warranty of workmanlike performance in the face of the express warranty in the contract.

## CONCLUSIONS OF LAW

1. Albert Mascuilli was killed as the result of the parting of a shackle which was one of the component parts of the gear at No. 3 hatch, which had been furnished by the United States and rigged by members of the crew of the USNS MARINE FIDDLER for the use by longshoremen.

2. The defendant's longshoremen negligently operated the after port and forward vang winches so as to exert an opposing pull and thereby place an excessive strain on the gear at No. 3 hatch.

3. The Government is bound in this action by the finding of the United States Supreme Court in Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967), that a prior unseaworthy condition was brought into play by the negligent operation of the winches by the longshoremen.

4. This unseaworthy condition contributed jointly with the negligence of the longshoremen in causing the death of Albert Mascuilli.

5. Clause 12(b)(1) of the parties' contract governs the responsibility of Northern Metal Company to indemnify the Government where the unseaworthiness of the vessel contributes jointly with the negligence of the stevedore in causing the injury.

6. Clause 12(b)(1) provides that the stevedore is relieved of responsibility to reimburse the Government if the unseaworthiness of the vessel contributed jointly with the contractor's negligence to cause injury unless (1) the contractor by exercising due diligence could have discovered the unseaworthiness, or (2) by exercising due diligence could have otherwise prevented the injury.

7. The prior unseaworthy condition could not have been discovered by the defendant through the exercise of due diligence, and the defendant, through the exercise of due diligence, could not have otherwise avoided the accident which caused the death of Albert Mascuilli.

8. The limitations upon the disclaimer of responsibility in clause 12(b)(1) do not apply to the circumstances of this case, and the Government is not entitled to recover indemnity from the defendant under the express terms of the contract.

9. Clause 12 is an express warranty of indemnification for the stevedore's negligence. It encompasses Northern Metal Company's total liability to the Government for negligence, and no implied warranty for workmanlike performance is applicable to the factual situation in this case.

10. Plaintiff is not entitled to recover from defendant.