*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SEAN A. JANES and JENNIFER M. JANES, Individually, and as Parents and Guardians of LINDIE R. JANES, KAMERON S. JANES, KOLTEN J. JANES, and SIENNA M. JANES, | ) ) ) ) ) | Supreme Court No. S-14593 |
| | ) | Superior Court No. 3AN-08-11544 CI |
| | ) | |
| | ) | O P I N I O N |
| Appellants, | ) | |
| | ) | No. 6829 - September 20, 2013 |
| v. | ) | |
| | ) | |
| ALASKA RAILBELT MARINE, LLC, ALASKA MARINE LINES, INC., LYNDEN INCORPORATED, NORTHLAND SERVICES, INC., and WESTERN TOWBOAT COMPANY, | ) ) ) ) ) ) ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Sharon Gleason, Judge.

Appearances: Brett von Gemmingen, Law Offices of Brett von Gemmingen, LLC, Anchorage, for Appellants. Thomas G. Waller and Mark Krisher, Bauer Moynihan & Johnson LLP, Seattle, Washington, for Appellees.

Before: Fabe, Chief Justice, Stowers, and Maassen, Justices,

and Eastaugh, Senior Justice.[*] [Carpeneti, Justice, and Winfree, Justice, not participating.]

EASTAUGH, Senior Justice.

## I.    INTRODUCTION

Sean Janes, a railroad conductor, was injured while railcars were being loaded onto a barge built to transport railcars and non-rail cargo at the same time. The railcars were rolling on tracks which ran from the stern to the bow of the barge. As the railcars approached non-rail cargo that had been placed across the tracks, Janes's supervisor ordered him to "dump it," i.e., engage the railcars' emergency brakes. Janes then moved in front of the lead railcar and engaged the emergency brakes. But he was unable to withdraw and was badly injured when the lead railcar pinned him against the non-rail cargo.

Janes and his family sued the barge owner, alleging that placing cargo across the tracks and failing to provide devices to stop moving railcars from hitting the non-rail cargo made the barge unseaworthy under federal maritime law. After a bench trial, the superior court found that the barge was reasonably fit for its intended purpose and that Janes had not proved that the barge was unseaworthy. On appeal, Janes argues that the court erroneously rejected his unseaworthiness claim. Because the superior court's findings of fact were not clearly erroneous and because the court committed no legal error, we affirm.

---

[*]    Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

## II.    FACTS AND PROCEEDINGS

### A.    Facts

#### 1.    Overview

On November 2, 2006, Sean Janes was employed by the Alaska Railroad Corporation and was part of an Alaska Railroad crew loading railcars onto a barge, the FAIRBANKS PROVIDER, in Whittier.[1]   Janes was the conductor during the loading operation.

#### 2.    The FAIRBANKS PROVIDER

The FAIRBANKS PROVIDER is owned and operated by Alaska Railbelt Marine (ARM), a subsidiary of Lynden Incorporated.  It was one of three barges designed and built in response to an Alaska Railroad request for proposal.[2]  The request required that the barges be able to carry railcars and non-rail deck cargo at the same time. It also required the design to include a lashing system to secure the railcars.

The FAIRBANKS PROVIDER entered service sometime between 2000 and 2002.  It is a flat-deck cargo barge; it is approximately 400 feet long; eight parallel sets of railroad tracks run from its stern to a head block and breakwater near the bow of the barge.  The tracks are used to load and transport railcars.  In part to improve the barge's structural integrity and eliminate the tripping hazard T-shaped rail would have created, the tracks are flat-bar rail, rather than standard T-shaped rail.  A fixed coupler (consisting of a car bumper and a knuckle, the mechanism used to couple railcars together) at the forward end of each track is connected to a head block, slightly aft of the breakwater.

---

[1]    The superior court conducted a bench trial.  Our description of the barge and the accident is based on the trial evidence.

[2]    ARM was created by Lynden Incorporated to carry out its proposal to build and operate the rail barges requested by the Alaska Railroad in its request for proposal.

The exact purpose of the fixed couplers was disputed at trial, but they were at least a lashing mechanism to hold the railcars in place during transit.

Non-rail cargo is placed across some of the tracks in leased deck space near the bow of the barge; placing cargo across the tracks prevents railcars from reaching the fixed couplers for those tracks. When the barge was being designed, ARM and the naval architect, Michael Whalen, discussed the possibility of building portable couplers that could be placed aft of the non-rail cargo. Whalen's firm hired a third party to design portable couplers mimicking the fixed couplers. But, as Lynden Chief Operating Officer Jonathan Burdick and Lynden's port engineer George Williamson testified, Lynden was concerned that it was not practical to attach portable couplers to flat-bar rail and that portable couplers might break if hit by railcars. ARM therefore decided not to build portable couplers. The intended purpose of the proposed but rejected portable couplers was disputed; ARM's witnesses described them as couplers that would simplify immobilization of the railcars during transport and denied that they were intended to stop rolling railcars during loading. There was evidence that some engineering drawings of the proposed devices referred to them as "portable track stops," potentially implying that they were intended to stop rolling railcars. In practice, lashing mechanisms, including chains, jacks, and rail chocks, were used to secure railcars that were not coupled to the fixed couplers after they were loaded aboard.

### 3. Loading railcars onto the barge

An Alaska Railroad crew loads the railcars onto the barge. The crew includes a conductor, a brakeman, an engineer, and a supervisor; there is also a slip operator who controls the slip (the rail-bearing ramp that runs from shore to the barge); they communicate by radio. Each railcar is approximately 50 feet long. The number of railcars to be loaded onto a given track depends in part on the placement of any non-rail

cargo. Using the radio, the conductor directs the movement of the railcars by telling the engineer in the locomotive what to do.

During loading, tracks on the slip are aligned with the barge's tracks and the string of railcars is pushed backwards onto the barge by a locomotive or locomotives. Because the locomotive is at the front of the string and backs the string onto the barge, the last railcar in the string is the first car onto the barge. We will sometimes refer to this railcar as the string's "lead" car during loading. The string includes the railcars being loaded onto a particular set of tracks and the railcars still to be loaded onto other tracks.

The string's movement is controlled primarily by the locomotive. When the locomotive stops, railcars in the string can continue to roll forward (toward the bow of the barge) until the couplings between the railcars completely stretch out; this phenomenon is called "slack." The coupler at each end of a railcar can permit eight inches of slack, so the couplers joining two cars can permit up to 16 inches of slack when the couplers are completely stretched out. The total amount of slack for the string depends on the number of cars. To stop a string of railcars precisely, slack must be controlled.

Three systems are potentially available to brake the string of railcars: (1) the locomotive's independent brake, which is the only brake system that, per Alaska Railroad operating rules, is supposed to be used when loading a barge; (2) a dynamic braking system; and (3) the airbrake system, an emergency braking system that connects and actuates the airbrakes on each railcar; it is not to be used on a barge. The emergency airbrake system can be engaged either from the locomotive or by turning an angle cock at the leading end of the lead railcar.

In addition, each individual railcar has its own separate handbrake that can be engaged by a wheel at the end of the railcar to provide variable braking force to that railcar; the braking power of the car's handbrake depends on how tightly the brake is

"tied." Tying the handbrake of the lead railcar can eliminate slack and "bunch" the railcars in the string as the locomotive pushes the railcars into the resistance created by the lead railcar's handbrake.

It was undisputed that it is Alaska Railroad policy to perform a safety stop when the leading end of the lead railcar is a railcar length, approximately 50 feet, from the final stopping point to control the slack when loading a string of railcars. Per railroad policy, the maximum speed during loading is three miles per hour. There was evidence at trial that in actual practice, loading speeds are lower than that.

If there is no non-rail cargo across a track, the string is attached to the track's fixed coupler by slowly pushing the lead railcar's coupler into the fixed coupler. If non-rail cargo has been placed across the track, the railcars must be stopped within three to five feet of the non-rail cargo. In their final position, the railcars must be bunched together to eliminate slack. The railcars are then lashed down with chocks and chains for transport. After a track is loaded, the string of railcars is cut down and, if necessary, the slip is moved to align it with the next track so railcars can be pushed aboard on that track.

### 4.    The accident

On the day of the accident, Janes was the conductor; he used a radio to direct the movement of the railcars onto the barge. Non-rail cargo had been placed across the tracks in the leased cargo space. Jason Dennis, Janes's supervisor, oversaw the loading process.

While loading Track 5, Janes and Dennis were near the non-rail cargo on the barge. Six railcars were supposed to be loaded onto Track 5. By radio, Janes successfully directed the engineer to perform a routine safety stop when the string's lead car was approximately 50 feet from the non-rail cargo on Track 5. Janes successfully directed a second safety stop when the lead railcar was approximately 15 feet from the

non-rail cargo. Janes was then informed by his brakeman that they needed to move ten more feet of the string aboard to fit the six railcars onto Track 5. Janes tied a "slight" handbrake on what was apparently the closest car to the deck cargo to control and bunch the railcars and then directed the engineer to continue pushing, i.e., to continue pushing the string onto the barge. There is some dispute about what happened next, and exactly what Janes told the engineer to do after this push. Janes testified that when the lead railcar was 10 to 12 feet from the cargo, he told the engineer to "plug it," i.e., to use the emergency airbrake to stop the train. Although Janes thought there should have been time for the engineer to pull the lever for the emergency airbrake, the engineer did not respond, or was not responding fast enough. Dennis, realizing that the train was going to hit the non-rail cargo, yelled at Janes two or three times to "plug it" or "dump it," i.e., to engage the emergency airbrake system using the angle cock at the far end of the lead railcar. Janes, who had been standing beside the lead railcar, moved to the front of that railcar and turned its angle cock to engage the emergency airbrake. But after doing so, he could not withdraw in time, and he was pinned between the lead railcar and the non-rail cargo and was badly injured.

Railroad safety policies prohibit employees from approaching or going in front of a moving railcar. Using the airbrake on the barge is also against railroad operating rules. There was overwhelming evidence, undisputed at trial, that the actions of Janes and his supervisor in trying to stop the string with the emergency airbrakes on the barge went against almost every operating rule of the railroad.

B.    **Proceedings**

Janes and his family (collectively, Janes) sued ARM and others for

negligence and unseaworthiness.[3]  Superior Court Judge Sharon Gleason conducted a bench trial in 2011.  In his opening statement on the first day of trial, Janes's attorney's comments regarding seaworthiness focused on ARM's failure to provide "portable track stops" to prevent railcars from rolling into the cargo that obstructed the fixed couplers. The superior court then heard testimony from ten witnesses and received deposition testimony from six others.  The witnesses included Janes; persons who witnessed the accident; railroad employees; personnel involved in the design, loading, and operation of the FAIRBANKS PROVIDER; and experts in naval architecture and safety.  The superior court also admitted more than 75 exhibits into evidence, including the Alaska Railroad's request for proposal, diagrams of the design specifications for the barge and the couplers, and the railroad's operation and safety manuals.

In his closing argument, Janes's counsel contended that if there was "too much slack," the lead railcar would hit the cargo.  He argued that because the solution to "too much slack" was allowing the lead railcar to hit the cargo, the barge was not reasonably fit to carry cargo.  He also argued that the failure to provide devices to stop the movement of railcars made the barge unseaworthy.  After trial, Janes submitted proposed unseaworthiness findings of fact and conclusions of law that focused on the failure to provide devices to stop railcars from rolling into deck cargo.  The proposed conclusions identified two conditions that rendered the FAIRBANKS PROVIDER unseaworthy: (1) the "foul[ing of] the railroad tracks with deck cargo, [which] prevent[ed] the railcars from reaching the [fixed couplers] at the bow of the barge," and

---

[3]  Only the unseaworthiness claim against ARM is at issue in this appeal.  The other defendants at trial were Lynden Incorporated (ARM's parent company); Alaska Marine Lines, Inc. (which chartered deck cargo space and was responsible for lashing its own cargo); Northland Services, Inc. (which leased deck cargo space and was responsible for lashing railcars by agreement with the Alaska Railroad); and Western Towboat Company (owner and operator of the tugboat for the FAIRBANKS PROVIDER).

(2) the absence of any "portable track stops" to prevent the railcars from hitting the non-rail cargo placed across the tracks. The proposed findings reasoned that without a stopping device, the loading process was unsafe because the railcars could not be precisely stopped. Janes asked the court to find that the fixed couplers, and the portable couplers considered during the barge's design process, were intended to stop a moving string of railcars. And he asked the court to find that even if a portable coupler could not stop a string of railcars, a portable track stop would have eliminated the possibility that Janes would engage the airbrake to prevent the railcars from hitting the non-rail cargo.

The defendants' core arguments regarding the unseaworthiness claim were that: (1) the railroad's procedures for loading railcars were effective and safe without a stopping device; (2) the barge's fixed couplers were not stopping devices and therefore obstructing them with deck cargo did not make the barge unseaworthy; (3) the portable couplers considered and rejected during the barge design were lashing devices and were not a viable or safe means of stopping railcars; (4) plaintiffs presented no credible evidence that there was a portable track stop device capable of stopping a moving string of railcars; and (5) it was not foreseeable that Janes's supervisor would give, and that Janes would obey, an order to place himself in front of the moving string of railcars to engage the angle cock.

## C.     The Superior Court's Rulings

The superior court ruled for the defendants on both the negligence and unseaworthiness claims.

As to the unseaworthiness claim, the superior court concluded that Janes had "failed to demonstrate by a preponderance of the evidence that the barge FAIRBANKS PROVIDER was unseaworthy." It found that "[t]he FAIRBANKS PROVIDER was reasonably fit for its intended purpose of transporting rail, containerized and breakbulk cargo between Whittier and Seattle."

To support these rulings the superior court made a number of factual findings regarding the procedure and equipment for loading and stopping railcars on the barge. It found that the barge's design required that non-rail cargo be placed at the bow of the vessel, across the tracks. It found that the barge's fixed couplers were intended to be used *only* as lashing devices and were not designed to stop a moving string of railcars. It found that the railroad was "fully capable of safely stopping railcars without the aid of or need for additional stopping devices aboard the rail barges." It found that the railroad's procedures had "proven to be an effective and reasonably safe means to control and stop" the railcars. It found that on the day of the incident, it was more likely than not that the slack between the railcars had been removed in the final safety stop. It found that Janes had not demonstrated that safer alternatives for stopping the railcars existed. Because Janes had not shown that a portable coupler would have been able to stop a string of moving railcars, the court was unpersuaded that a portable coupler would have prevented Janes's injury.

The court also made a number of findings regarding causation. It found that, even if Janes had shown the existence of an unseaworthy condition, unseaworthiness did not proximately cause Janes's injuries. It found that it was not foreseeable that Janes's supervisor would give and that Janes would obey an order to engage the emergency brake on the lead railcar, violating railroad policy and jeopardizing Janes's personal safety, to protect cargo. It found that the supervisor's unforeseeable order, not any unseaworthy condition, was the proximate cause of Janes's injuries. The court also found that any unseaworthy condition created by Janes's supervisor's negligently given order "was instant and therefore not a proper basis for recovery."

Janes's appeal arguments address only his claim of unseaworthiness.

## III. STANDARD OF REVIEW

An unseaworthiness claim asserts a federal maritime tort; federal substantive law therefore controls.[4] "The application of maritime remedies involves mixed questions of law and fact. We review the superior court's factual findings under the clearly erroneous standard but review questions of law de novo."[5] A factual finding is clearly erroneous if, after studying the record, we are "left with a definite and firm conviction that a mistake has been committed."[6] Whether an unseaworthy condition exists generally presents a question of fact.[7]

We review a superior court's evidentiary rulings for abuse of discretion.[8] We will only reverse evidentiary rulings that are both erroneous and prejudicial.[9]

---

[4] *Brown v. State*, 816 P.2d 1368, 1371 (Alaska 1991) (citing *Barber v. New England Fish Co.*, 510 P.2d 806, 808 (Alaska 1973)) (applying federal law to plaintiff's unseaworthiness claims under the Jones Act (current version at 46 U.S.C. § 30104 (2006))).

[5] *Cavin v. State, Fish & Wildlife Prot. Div. of the Dep't of Pub. Safety*, 3 P.3d 323, 326 (Alaska 2000) (citing *Moody-Herrera v. State, Dep't of Natural Res.*, 967 P.2d 79, 82 (Alaska 1998)) (applying those standards in reviewing judgment denying state employee's maritime claims, including common law unseaworthiness claim).

[6] *McAllister v. United States*, 348 U.S. 19, 20 (1954); *Peterson v. Ek*, 93 P.3d 458, 465 (Alaska 2004).

[7] *Folger Coffee Co. v. Olivebank*, 201 F.3d 632, 636 (5th Cir. 2000); *Jordan v. U.S. Lines, Inc.*, 738 F.2d 48, 50 (1st Cir. 1984).

[8] *Bierria v. Dickinson Mfg. Co.*, 36 P.3d 654, 657 (Alaska 2001).

[9] *Schofield v. City of St. Paul*, 238 P.3d 603, 606 (Alaska 2010) (citing *Noffke v. Perez*, 178 P.3d 1141, 1148 (Alaska 2008)).

## IV.    DISCUSSION

### A.    The Superior Court Did Not Err In Ruling That The Barge "Was Reasonably Fit For Its Intended Purpose" And That It Was Not Shown To Be Unseaworthy.

Vessel owners have an absolute and nondelegable duty to provide a seaworthy ship.[10] To make out an unseaworthiness claim, plaintiffs must establish that: (1) the warranty of seaworthiness extended to them and their duties;[11] (2) their injury was caused by the ship or its equipment or appurtenances; (3) an unseaworthy condition existed on the vessel, its equipment, or appurtenances; and (4) the unseaworthy condition was a proximate cause of their injuries.[12] If a plaintiff fails to establish any one of these elements, the unseaworthiness claim must fail.[13]

Janes argues that in rejecting his unseaworthiness claim, the superior court committed various errors, most of which he characterizes as legal errors. He argues that

---

[10]    *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 90 (1946); *see also Williams v. Municipality of Anchorage*, 633 P.2d 248, 251 (Alaska 1981) ("The idea of seaworthiness and the doctrine of implied warranty of seaworthiness arises out of the vessel, and the critical consideration in applying the doctrine is that the person sought to be held legally liable must be in the relationship of an owner or operator of a vessel." (quoting *Daniels v. Fla. Power & Light Co.*, 317 F.2d 41, 43 (5th Cir. 1963))).

[11]    *Sieracki*, 328 U.S. at 99 (holding that the warranty of seaworthiness extends to any worker injured while "doing a seaman's work and incurring a seaman's hazards"); *see also Cavin v. State, Fish & Wildlife Prot. Div. of the Dep't of Pub. Safety*, 3 P.3d 323, 330-32 (Alaska 2000) (holding that the *Sieracki* remedy is still available to those not covered by the 1972 amendments to the Longshore and Harbor Workers' Compensation Act).

[12]    *Ribitzki v. Canmar Reading & Bates, Ltd.*, 111 F.3d 658, 664 (9th Cir. 1997); THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 6-25 (5th ed. 2011).

[13]    *See Ribitzki*, 111 F.3d at 664-65.

-12-                                    6829

the court failed to take into account the nondelegable nature of the warranty of seaworthiness, and that ARM consequently should have been held liable as a matter of law for unseaworthy conditions created by the railroad during the loading process. He argues that — contrary to the superior court's finding that the barge was reasonably fit for its intended purpose — the barge was unseaworthy as a matter of law because allowing railcars to roll too far forward endangered the cargo, rendering the barge unfit for its intended purpose. He argues that "unrebutted evidence" establishes the barge's unseaworthy condition. He argues that the court mis-allocated the burden of proof concerning the feasibility of portable couplers in stopping rolling railcars. And he argues that the court's findings regarding the effectiveness of portable stopping devices were clearly erroneous.[14]

These arguments, including those that assert legal errors, largely turn on whether the court's factual findings were clearly erroneous.

Several preliminary comments are appropriate.

First, as ARM points out, Janes has advanced new theories of liability on appeal that he did not argue at trial. Generally, we will not consider new theories of liability first raised on appeal.[15] Janes argued in the superior court that two specific

---

[14]     Our resolution of these arguments makes it unnecessary to consider Janes's additional contention that the superior court erred in finding that any assumed unseaworthy condition was not the proximate cause of Janes's injuries.

We likewise do not need to consider ARM's alternative arguments that the warranty of seaworthiness did not extend to Janes, or that the exclusive remedy provision of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b) (2006), barred Janes's unseaworthiness claim.

[15]     *Pitka v. Interior Reg'l Hous. Auth.*, 54 P.3d 785, 788-89 (Alaska 2002) ("In general, parties cannot advance new theories or raise new issues in order to secure a reversal of the lower court's determination." (quoting *O'Neill Investigations, Inc. v. Ill.*

(continued...)

conditions made the vessel unseaworthy. It was in that factual context that the parties tried the case and asked the trial court to rule. We will therefore review the trial court's rulings in light of the two specific conditions Janes alleged in his opening statement at trial and explained more fully in his proposed findings and conclusions: (1) the "foul[ing of] the railroad tracks with deck cargo, [which] prevent[ed] the railcars from reaching the [fixed couplers] at the bow of the barge," and (2) the absence of any "portable track stops" to prevent the railcars from hitting the non-rail deck cargo.[16]

Second, contrary to Janes's contention here, the superior court did not ignore the nondelegable nature of the warranty of seaworthiness. Its rulings demonstrate that the court recognized that ARM could be held liable for unseaworthy conditions created by others, including the railroad. Thus, it stated that ARM had an "absolute duty to provide a seaworthy vessel." And it characterized as "instant" — and "therefore not a proper basis" for an unseaworthiness claim against ARM — "[a]ny unseaworthy condition" created by Janes's supervisor when he negligently ordered Janes to "dump

---

[15]      (...continued)
*Emp'rs Ins.*, 636 P.2d 1170, 1175 n.7 (Alaska 1981) (internal quotation marks omitted)). In *Pitka* we declined to consider arguments Pitka did not raise in the superior court, and stated that "[i]n order to determine whether the 'new' arguments will be considered here, we ask whether they were raised expressly below and, if not, whether they are closely related to the trial court arguments and could have been gleaned from the pleadings." *Pitka*, 54 P.3d at 788; *see also City of Hydaburg v. Hydaburg Coop. Ass'n*, 858 P.2d 1131, 1136 (Alaska 1993).

[16]      We therefore will not consider Janes's appellate contentions that the absence of devices other than portable track stops or couplers — such as a device to engage the emergency airbrakes remotely — rendered the barge unseaworthy. At trial there was evidence about the remote-control device, but Janes did not argue, or ask the superior court to find, that the failure to provide or use that device on the FAIRBANKS PROVIDER made the barge unseaworthy.

it." That was an implicit recognition by the superior court that ARM could have been held liable for an unseaworthy condition created by the railroad.[17]

### 1. The record supports the superior court's factual findings.

An unseaworthy condition exists if the vessel, including its equipment and appurtenances, is not reasonably fit for its intended use.[18] The warranty of seaworthiness extends to a vessel's fitness for loading and unloading.[19] Various circumstances can render a vessel unseaworthy,[20] including unsafe work methods or a lack of safety equipment.[21]

---

[17] The superior court permissibly found that any such condition attributable to the railroad was "instant"; Janes does not argue that the court erred in concluding that an instant condition would not have been actionable. *See Luckenbach Overseas Corp. v. Usner*, 413 F.2d 984, 985-86 (5th Cir. 1969), *aff'd*, *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494 (1971) (holding that a vessel is not rendered unseaworthy as a result of "the instantaneous negligence of stevedores"). The court's discussion of instant unseaworthiness potentially arising from the supervisor's order did not interfere with its separate consideration, and rejection, of Janes's claims that placing cargo across Track 5 or failing to provide stopping devices created unseaworthy conditions. Moreover, Janes never contended that the negligently given order rendered the barge unseaworthy.

[18] *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 213 (1963) ("[All] things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used."); *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960).

[19] *Gutierrez*, 373 U.S. at 213 (citing *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 96 (1946)).

[20] *Morales v. City of Galveston, Tex.*, 370 U.S. 165, 170 (1962) ("A vessel's unseaworthiness might arise from any number of individualized circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The method of loading her cargo, or the manner of its stowage, might be improper.").

[21] *E.g.*, *Salem v. U.S. Lines Co.*, 370 U.S. 31, 36 (1962) (suggesting that lack
(continued...)

We set out above the superior court's fact findings most relevant to the unseaworthiness claim. The superior court concluded that Janes failed to demonstrate that the barge was unseaworthy; it ultimately ruled that the barge "was reasonably fit for its intended purpose of transporting rail, containerized and breakbulk cargo between Whittier and Seattle." It consequently rejected Janes's seaworthiness claim.

Janes argues that the superior court clearly erred in finding that the FAIRBANKS PROVIDER was seaworthy. Janes reasons that because evidence showed that railcars often rolled too far forward and that there was nothing to prevent them from rolling into the deck cargo, "the cargo is not safe onboard the vessel"; from this he concludes that the barge was not reasonably fit for its intended purpose. According to Janes, unrebutted expert testimony established that the loading process was not safe without the use of track stop devices.

We conclude that ample evidence supported the court's factual findings about the safety of the loading process and the barge's seaworthiness. Adequate, creditable trial evidence rebutted Janes's assertion that railcars could not be safely stopped. For example, Janes's supervisor at the time of the accident testified that a conductor could stop a string of railcars within inches or feet of where it needs to be. Janes's supervisor testified that the railroad's conductors and engineers would typically put the railcars within three to five feet of the deck cargo.

Janes presented evidence that slack in the railcars' couplers, if not controlled, could permit the railcars to continue to roll forward after the locomotive's brakes were engaged. But there was also evidence about the effectiveness of the

---

[21]    (...continued)
of safety equipment may render a vessel unseaworthy); *Tucker v. Calmar S.S. Corp.*, 457 F.2d 440, 446 (4th Cir. 1972) (unsafe cargo loading method rendered vessel unseaworthy).

railroad's loading procedures in controlling and eliminating slack and stopping a string safely. These procedures required railroad employees to perform a safety stop approximately 50 or 60 feet from the final stopping point to ensure that the string of railcars was under control. The railroad's crew successfully performed the 50-foot safety stop on this occasion. Janes testified that the crew also successfully performed a second safety stop, 15 feet from the deck cargo. There was evidence about using braking mechanisms to control slack. Janes testified that during the 15-foot safety stop he had tied the handbrake on the lead railcar to bunch the railcars to control the slack. The court found "on a more likely than not basis that the slack between the cars had been removed." The court did not clearly err in so finding. That finding resolved any contention that slack had created an unseaworthy condition or had contributed to Janes's accident.

Moreover, Janes's supervisor, who had six years of experience on railcar barges at the time of the accident, testified that no physical stopping device was necessary to safely stop the railcars because their movement could be controlled with just the locomotive and railcars. Tugboat captain Dwaine Whitney had worked for five years with ARM and had also been employed by two other companies to captain tugboats towing railcar barges. He testified, based on his experience working with ARM and with other railcar barges, that couplers were not stopping devices; he testified that no device "built by man" could stop moving railcars on the barge deck. He testified that instead of stopping the string, any device placed on the tracks would cause the cars to derail, resulting in damage to the railcars and the barge deck. Whitney further explained that other companies employed the same methods to stop a string of railcars during loading: performing a safety stop and then pushing the string back to a final position.

Janes presented little evidence that the loading procedures employed by the railroad were dangerous and adduced no evidence of any other injuries sustained during

loading or instances in which the railcars had hit cargo containers. The superior court found that no evidence was presented of any other injuries involving persons or property from loading railcars on the Whittier barges, and Janes's appeal does not challenge this finding. The superior court's finding that the railroad was capable of safely stopping a string of railcars without track stop devices was amply supported by the evidence.

Even if, as Janes argues, there was a risk the railcars *could* hit the cargo, the evidence was sufficient to support the superior court's finding that the loading process was reasonably safe. Janes claimed that the risk to cargo could cause employees, like Janes, to endanger themselves in attempting to save the cargo by engaging the emergency brake. But there was ample evidence that rigorous railroad procedures prevented employees from endangering themselves in that way. Thus, the railroad's safety procedures clearly prohibited employees from going in front of or even approaching moving railcars. And engaging the airbrake on the barge was prohibited. Railroad policy thus mitigated any inherent risk of injury from loading the railcars. As the United States Supreme Court has recognized, a vessel owner's failure to eliminate every possible hazard does not necessarily make the vessel unseaworthy.[22]

Janes refers us to what he calls "unrebutted" evidence that the absence of devices to stop trains made the barge unseaworthy. Janes offered opinions from Robert Hall, Ph.D., an expert in human factors and safety engineering, and Lawson Bronson, an expert in naval architecture and marine engineering. Each expressed an opinion that the loading process was not safe because deck cargo blocked the fixed couplers and because

---

[22]     *See Mitchell*, 362 U.S. at 550 ("The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service.") (citation omitted); *see also* THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 6-25 (5th ed. 2011) ("The shipowner is not required to provide the latest and best equipment and there is no warranty for an accident free ship.").

the vessel did not provide portable track stops. To support his opinion, Hall relied on an Occupational Safety & Health Administration (OSHA) regulation requiring that track stop devices be used on railroad tracks on land.[23] Bronson testified that the purpose of the fixed couplers on the barge was to stop a moving string of railcars, and that there were commercially available portable track stops that could have been modified for use on the barge.

As we explain below, Janes's evidence was not "unrebutted," other evidence broadly rebutted the opinions of Janes's experts, and the superior court permissibly chose to disregard their opinions.

The testimony of both experts was problematic. Bronson admitted that what Janes terms "commercially available track stop[s]" were designed to attach to standard T-shaped rail, and could not be attached to the flat-bar rail used on the barge. Neither witness provided designs or calculations to support their assertions that portable track stops were necessary or effective. Bronson had made no calculations about whether the track stops he discussed would pull up the barge deck when struck by the railcars, whether railcars might crush a stop, or whether the railcars would just push a stop forward.

The experts' failure to offer designs or calculations to support their opinions caused the superior court to disregard their opinions: It stated that the "failure to offer any detailed designs or calculations with respect to proposed portable coupling devices rendered [Janes's] experts' opinions not helpful to the court." Although Janes argues that it was error to ignore the "unrebutted" expert testimony, he does not argue that the court abused its discretion by ruling that the absence of designs or calculations made the

---

[23] 29 C.F.R. § 1910.176(f) (2006) provides that "[d]erail and/or bumper blocks shall be provided on spur railroad tracks where a rolling car could contact other cars being worked, enter a building, work or traffic area."

experts' opinions "not helpful." The court was not obliged to credit the opinions offered by Janes's experts. It permissibly exercised its discretion in giving their opinions no weight.

When acting as the trier of fact, the superior court may weigh conflicting evidence and draw its own conclusions.[24] The opinions of the two experts were broadly contradicted by witnesses who had participated in designing the barge and by employees involved in the loading process on the day of the accident. There was general consensus among these witnesses that neither the fixed couplers nor the portable couplers considered but rejected during design were intended to stop a string of moving railcars. Michael Whalen, the naval architect who designed the barge, explained in detail the portable coupler designs and forces involved in stopping railcars. He explained that the portable couplers had been designed to withstand the same force as the fixed couplers. According to his calculations, the fixed and portable couplers could only withstand 200,000 pounds of force before they would start to fail or break. There was evidence that the string of railcars weighed 3,000,000-4,000,000 pounds. Whalen testified that a string of 20 railcars moving at approximately one mile per hour could generate over 1,000,000 pounds of force and that no commercially available track stops could have withstood such a force. He also testified that it was not feasible to build a stopping device that could attach to flat-bar rail track, because all available devices were designed for T-shaped rails. He explained that flat-bar track had been used to eliminate other safety hazards during the loading process. Lynden's President and Chief Operating

---

[24] *See Sanford Bros. Boats, Inc. v. Vidrine*, 412 F.2d 958, 969 (5th Cir. 1969) (explaining it is the role of the fact finder to "weigh[] the contradictory evidence and inferences, judge[] the credibility of witnesses . . . and draw[] the ultimate conclusion as to the facts"); *see also Peterson v. Ek*, 93 P.3d 458, 464 (Alaska 2004) ("[I]t is the province of the trial court to judge witnesses' credibility and weigh conflicting evidence.").

Officer, Jonathan Burdick, and Lynden's port engineer, George Williamson,[25] both explained ARM's decision not to include portable couplers; they confirmed Whalen's opinion that a portable track stop was not practical.

The superior court heard evidence that attempting to use fixed or portable couplers to stop a string of railcars could make the loading process more dangerous: If the railcars hit the fixed couplers or portable couplers too hard, they could cause the barge to pull away from the slip, resulting in the slip and everything on it falling in the water. And there was evidence that if a portable coupler failed when hit by a railcar it could result in flying metal parts.

This evidence supported the superior court's findings that the railroad's loading procedures were effective and reasonably safe in controlling and stopping railcars, that no additional stopping devices were needed, and that Janes had not demonstrated that there are safer, more viable means to stop railcars. Therefore, the evidence supported the court's ruling that the barge was reasonably fit for its intended purpose of carrying and transporting rail and non-rail cargo. The evidence also supports a conclusion that the loading procedures did not in fact jeopardize either the cargo or anyone loading the railcars. Janes's argument to the contrary does not demonstrate that the superior court clearly erred.

Contrary to Janes's argument, the OSHA regulation relied on by Janes's expert Hall did not compel the superior court to find unseaworthiness. The regulation

---

[25]     Burdick was the President and Chief Operating Officer of Lynden Incorporated and the President of ARM. In those roles, he had been in charge of Lynden's response to Alaska Railroad's request for proposal and the creation of ARM to build and operate the railcar barges. At the time of trial, Williamson was employed by Lynden. As port engineer, Williamson had been the person primarily in charge of ARM's response to the request for proposal and thus the design of the railcar barges. After the barges were built, he was in charge of ensuring their functionality.

requires "[d]erail and/or bumper blocks," but it does not apply to the railroad tracks on the barge.[26] The superior court was not obliged to rely on a facially inapplicable OSHA standard not endorsed by credible expert evidence from Hall or anyone else.

Janes argues that the OSHA regulation establishes an industrial standard calling for the use of a stopping device. But after the court ruled that the opinions of Janes's experts were not helpful, there was no credible evidence that the regulation set a standard that was in any way relevant to loading railcars on barges. Hall asserted that the OSHA standard showed there was a safer way of loading the railcars, but he admitted that he had never actually seen a track stop device, that modifications would have to be made to use a track stop device on the barge, and that he had done no calculations to see whether using a track stop on the barge was feasible or whether a track stop might fail if used on the barge. His testimony merely posited an unsupported theory that a track stop could be used on the barge. Evidence rebutting his unsupported theory was based on actual calculations made when the barge was designed, and by testimony of witnesses that using "stopping devices" could create safety hazards.

Finally, in a claim of unseaworthiness, adherence or non-adherence to industrial standards is not itself determinative of a vessel's reasonable fitness for its intended purpose.[27] Tugboat captain Dwaine Whitney testified that the procedures used to stop railcars by ARM were "essentially the same" as those used on other railcar barges. He testified that some railcar barges do not even have fixed couplers; railcars in those operations are stopped without using fixed couplers and railcars on those barges are lashed using only chocks and chains. The superior court could conclude from this

---

[26]     29 C.F.R. § 1910.176(f) (2006).

[27]     *See Bryant v. Partenreederei-Ernest Russ*, 330 F.2d 185, 190 (4th Cir. 1964) (citing *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 95 (1946)) (explaining that industrial standards are some evidence that a ship is seaworthy, but are not conclusive).

evidence that there was no reason to borrow the OSHA standard in assessing the seaworthiness of the FAIRBANKS PROVIDER.

As the trier of fact, the superior court could weigh the evidence. We conclude that the court's finding that the FAIRBANKS PROVIDER was reasonably fit for its intended purpose was not clearly erroneous.

> **2. The superior court did not err in considering the feasibility of the devices critical to Janes's claims of unseaworthiness.**

Janes argues that the superior court committed legal error by requiring Janes to prove the feasibility of portable track stops in order to show the existence of an unseaworthy condition. He contends that as a matter of law the defendant in an unseaworthiness case bears the burden of proving that safety devices are not feasible. ARM responds that the superior court properly allocated the burden to Janes because he had not proved that a defective condition existed. ARM contends that the burden of proof concerning the feasibility of safety devices can be shifted to the defendant only after the plaintiff has proved that an unseaworthy condition exists.

The parties agree that a seaman claiming unseaworthiness bears the burden of proving the existence of a defective condition. The question here is whether a seaman who claims that a failure to provide alternative equipment or an alternative method of operation creates an unseaworthy condition bears the burden of proving that the alternative is feasible.

Generally, courts consider alternative equipment or work methods to be relevant to the issue of whether the vessel was reasonably safe and therefore reasonably fit for its intended purpose.[28] The Fourth Circuit went further in *Tucker v. Calmar S.S.*

---

[28]    *See, e.g., Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 905 (6th Cir. 2006) (citing *Locke v. River Lines, Inc.*, 248 F. Supp. 92, 94-96 (N.D. Cal. 1964))
(continued...)

*Corp.*, commenting that "[t]he availability of safer methods of operation *must* be taken into account in meeting the *initial determination* whether the equipment used was in fact reasonably safe."[29] Several courts have held that the mere existence of alternative equipment or an alternative method of work is insufficient by itself to show that the method used was not reasonably fit for its intended purpose.[30] Seaworthiness does not require that the vessel, its equipment, or its appurtenances be perfect; they must only be reasonably fit for their intended purpose.[31] A reasonableness analysis in the seaworthiness context weighs the risk presented by the vessel's equipment or method of work against the availability of safer alternatives.[32]

---

[28]    (...continued)
(explaining safer alternatives are relevant, but not dispositive, to reasonableness); *see also Tucker v. Calmar S.S. Corp.*, 457 F.2d 440, 445 (4th Cir. 1972) (evaluating whether loading method was reasonably safe in an unseaworthiness action based on injuries sustained during loading).

[29]    457 F.2d at 445 (emphasis added) (holding that the risk of serious injury and the availability of safer equipment rendered the ship's use of certain equipment unseaworthy).

[30]    *Rogers v. Eagle Offshore Drilling Servs., Inc.*, 764 F.2d 300, 303-04 (5th Cir. 1985) (citing *Luneau v. Penrod Drilling Co.*, 720 F.2d 675 (5th Cir. 1983)) (requiring plaintiff to present sufficient evidence showing that a method of operation itself is unsafe, before a vessel can be rendered unseaworthy); *see also* THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 6-25 (5th ed. 2011) ("[T]he mere existence of an alternative method of work or alternative equipment is not sufficient in itself to show unseaworthiness.").

[31]    *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960).

[32]    *See Tucker*, 457 F.2d at 445 (weighing the operating efficiency, anticipated operating conditions, and the availability of safer alternatives to determine whether loading process was reasonably safe).

Plaintiffs can prove a defective condition in various ways.[33] In some cases, an unsafe condition in and of itself renders the vessel not reasonably fit for its intended purpose;[34] in other cases, a combination of risk and safer alternatives renders the vessel not reasonably fit for its intended purpose.[35] If a plaintiff seeks to prove a defective condition by showing that the vessel lacked a specific safety device or that alternative equipment would have been safer, the plaintiff must bear the burden of showing that the alternative equipment or method is feasible, i.e., that it is truly an alternative.[36]

Janes relies on *Salem v. United States Lines Co.*, where the plaintiff alleged that the ship was unseaworthy because it was not equipped with "necessary and feasible safety devices" that would have prevented his injuries.[37] In that case plaintiff fell while dismounting from the top of a ladder and moving to the crow's-nest platform; he argued

---

[33] *See Brown v. Dravo Corp.*, 258 F.2d 704, 706 (3d Cir. 1958) (explaining seaworthiness is "a relative concept, dependent in each instance upon the circumstances"); *Lester v. United States*, 234 F.2d 625, 628 (2d Cir. 1956) (same); *see also Marshall v. Ove Skou Rederi A/S*, 378 F.2d 193, 196 (5th Cir. 1967) (same, citing several sources).

[34] *E.g.*, *Salem v. U.S. Lines Co.*, 370 U.S. 31, 36 (1962) (holding lack of safety device rendered vessel unseaworthy and explaining it was not necessary for jury to find it was feasible to include such devices).

[35] *E.g.*, *Tucker*, 457 F.2d at 445 (holding vessel unseaworthy because adverse conditions and availability of safer equipment made risk of injury in loading process unreasonable).

[36] *See id.* (considering the availability of safer methods of operation in "the initial determination [of] whether the equipment used was in fact reasonably safe"); *see also* 78A C.J.S. *Seamen* § 251 (2013) ("[D]efendant need not make proof of any facts relied on as a defense until the seaman has established prima facie the liability of defendant for the injuries alleged to have been sustained.").

[37] *Salem*, 370 U.S. at 31-32.

that the shipowner should have provided railings or other safety devices around the platform.[38] The issue was whether the jury could find that an unseaworthy condition existed without receiving expert testimony on the feasibility of providing safety devices around the platform.[39] The United States Supreme Court concluded that expert testimony was not required if the jury could understand the danger presented by the alleged defective condition and therefore was competent to decide whether safety devices were reasonably necessary for the protection of a seaman.[40] After concluding that the plaintiff provided sufficient evidence showing that safety devices were necessary, the Supreme Court commented that the defendant could have presented evidence that it was not feasible to include railings.[41] We do not interpret the Court's comment as invariably requiring defendants to bear the burden of addressing the feasibility of alternative devices. Rather, the Court acknowledged that *if* a plaintiff establishes the existence of an unsafe or unseaworthy condition, *then* the defendant could, as an affirmative defense, present evidence that it was not feasible to include safety devices.[42] Even if a plaintiff

---

[38]    *Id.* at 32-33.

[39]    *Id.* at 34 (reversing holding of court of appeals that it was error to submit unseaworthiness question to jury where there was no expert testimony on proper marine architecture).

[40]    *Id.* at 36.

[41]    *Id.* at 37 ("[I]f there was a reason hidden from the ordinary mind why this condition of things must have existed, those facts called upon the defendant to make that reason known.").

[42]    *Id.*; *see also Jordan v. U.S. Lines, Inc.*, 738 F.2d 48, 50 (1st Cir. 1984) (upholding verdict for vessel owner where plaintiff presented evidence of imperfect equipment, but vessel owner presented rebuttal evidence that imperfect equipment was nonetheless reasonably fit for intended use); *Poignant v. United States*, 225 F.2d 595,

(continued...)

showed that an unsafe condition existed, a defendant could argue that the vessel was nonetheless reasonably fit for its intended purpose because it was not feasible to include safety devices.[43]  But here, unlike the plaintiff in *Salem*, Janes did not show that there was an unseaworthy condition; the superior court rejected his claim that the loading process was unsafe after considering the railroad's procedures and concluding that additional stopping devices were not needed.  The burden of establishing that the vessel was not reasonably fit remained with Janes; he could have met that burden by showing that portable track stop devices were necessary or would have made the loading process safer.  To hold otherwise would eviscerate the standard that vessels only be reasonably fit for their intended purpose, and would make shipowners absolutely liable for injuries occurring on their vessels.[44]

Moreover, two particular circumstances confirm that it was appropriate here to require Janes to prove the feasibility of track stops.

First, Janes's theories of unseaworthiness explicitly or implicitly posited that the barge was not reasonably fit either because the fixed couplers were obstructed or because portable track stops were not provided.  Janes claimed that it was the failure

_____

[42]     (...continued)
602 (2d Cir. 1955) (commenting that garbage left in a passageway might not constitute an unseaworthy condition if the defendant could show there was no reasonably available means of removing it).

[43]     *See Salem*, 370 U.S. at 37; *see also Jordan*, 738 F.2d at 51; *Poignant*, 225 F.2d at 602.

[44]     *Cf. Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960) ("The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service."); *Metcalfe v. Oswell Towing Co.*, 417 F.2d 313, 314 n.2 (5th Cir. 1969) ("[T]he mere fact that an accident occurs and a seaman is injured, without more, does not establish that a vessel is unseaworthy.").

to provide specific devices — either unobstructed fixed couplers, the portable couplers considered but rejected when the barges were designed, or what he described as "devices" that are "widely available commercially" — to stop moving railcars that made the barge unseaworthy. Janes did not argue (and could not have argued) that the presence of both railcars and non-rail cargo rendered the vessel unseaworthy, given that the purpose of the barge was to carry railcars and non-rail cargo at the same time. Therefore, critical to Janes's unseaworthiness claims regarding stopping devices was evidence that the devices (including the fixed couplers) would work as Janes claimed they should, i.e., stop a moving string of railcars.[45]

Second, the superior court made findings that effectively eliminated any implicit contention that any difficulty in precisely stopping railcars rendered the barge unseaworthy. It found that railcars can be safely stopped during loading; that the railroad's procedures were an effective and reasonably safe means to control and stop railcars; that the railroad was fully capable of safely stopping railcars without using additional stopping devices; and that the slack between railcars had been eliminated on this occasion. These findings confirmed that the essence of Janes's unseaworthiness claim was that additional stopping devices were needed to make the barge reasonably fit.

Therefore, given the way Janes presented his case, we conclude that to prove that the barge was not reasonably fit for loading and transporting railcars and deck cargo, Janes had the burden of proving that the fixed couplers or portable track stops would have made the loading process safer. If Janes had offered evidence that these devices made the loading process safer, the superior court could then have weighed the

---

[45] When Janes discussed the various devices in closing argument, the superior court asked counsel to point to "where in the record there would be evidence that would indicate that the stop at the front of the vessel would stop a group of railcars from going off" the bow of the barge.

-28- **6829**

risk and availability of safer alternatives to determine whether the loading process was not reasonably safe without fixed couplers or portable track stops.[46] The superior court did not err in placing the burden of proving the feasibility of using track stop devices on Janes. And the court did not err when it found that Janes "did not demonstrate that a safer, more viable means exists to halt or arrest the movement of the railcars" and when it found that the barge was reasonably fit for its intended purpose.

In sum, if the plaintiff asserts that the shipowner's failure to provide safer, alternative devices or methods renders a vessel unseaworthy, it is appropriate that the plaintiff bear the burden of proving that the alternative devices or methods are feasible. The burden of proof on the issue of the feasibility of alternative methods or devices shifts to the defendant only when non-feasibility is raised as an affirmative defense — and after the plaintiff has already shown the existence of an unseaworthy condition. Here, the superior court properly weighed the feasibility of Janes's proposed alternatives in determining whether he had proved that an unseaworthy condition existed. The superior court permissibly required Janes to prove the feasibility of the devices he claimed ARM should have provided.

## B. Admitting Michael Whalen's Deposition Testimony Into Evidence Was Neither An Abuse Of Discretion Nor Prejudicial.

Janes argues that the superior court committed reversible error when it admitted into evidence and relied upon portions of Michael Whalen's deposition over Janes's objection that the testimony was speculative.[47]

---

[46] *See Tucker v. Calmar S.S. Corp.*, 457 F.2d 440, 446 (4th Cir. 1972) (holding plaintiff had shown unseaworthy condition after weighing the risk of injury and the availability of safer equipment).

[47] Our resolution of this claim of error makes it unnecessary to consider
(continued...)

The disputed portion of Whalen's testimony discussed safety concerns about the proposed portable couplers.[48] Whalen was the naval architect who designed

---

**47**    (...continued)

whether ARM is correct in contending that Janes cannot object that the testimony is speculative because it was given when Whalen answered a question from Janes's attorney; ARM reasons that an interrogator can object to an answer to his own question only on the grounds of non-responsiveness. In support, ARM cites *INA Life Ins. Co. v. Brundin*, 533 P.2d 236, 244-45 (Alaska 1975), where, after determining that the superior court erred in excluding testimony as speculative, this court noted the general rule that an interrogator cannot object to an answer to his own question except on grounds of non-responsiveness.

**48**    In response to questions from Janes's counsel, Whalen testified:

> Q: And were you ever asked to incorporate design features that would prevent the rail car cargo from running into the deck cargo?
> A: There was discussion with Alaska Railbelt Marine regarding that. And at one point they asked us if we could take a look at coming up with a concept for something that could be used on the deck to – as kind of a portable coupler.
> Q: And what happened to those discussions?
> A: We hired an engineer to come up with a concept for that. And his design basically tried to duplicate the load carrying ability of the couplers at the forward end of the barge. And we gave that to Alaska Railbelt. But as far as what was decided after that, we weren't involved.
>
> I think there was some concern that – after we determined that we didn't feel that the couplers at the forward end of the barge were really designed for an out-of-control rail car, there was some concern that this portable coupler might not be suitable because it may not be able to stop an out-of-control rail car. And because . . . of the design of the rail tracks being flat bars, it's hard to grab anything with a portable coupler, so . . . then the issue became, is it more dangerous to put something on the deck that if it got hit by

(continued...)

the barge. He testified that after his firm hired an engineer to design portable couplers, he wasn't involved in deciding whether to include them on ARM's barges. He then testified that there were concerns that portable couplers would not be able to stop moving railcars and that placing a portable coupler in front of moving railcars might increase the danger. Janes argues that Whalen's testimony "as to the reasoning for any of the decisions that were made by ARM" was not based on his personal knowledge because he was not involved in ARM's decision-making. Janes argues that the court relied on the testimony in finding that "safety was a factor" in the decision not to provide "portable track stops." ARM responds that Whalen was testifying from his personal knowledge and that the admission of the disputed testimony was not prejudicial.

To the extent the quoted passage addresses why ARM decided not to adopt the design, it was arguably objectionable absent a suitable foundation. But most of the passage discusses events within Whalen's personal knowledge or matters well within his expertise. Whalen properly discussed the forces a slowly rolling string of railcars would generate and the ability of portable couplers to withstand those forces, and his testimony about those topics was admitted into evidence without objection. In his position as architect of the barge, Whalen became familiar with the design specifications and risks involved with the fixed and portable couplers.[49]

----

[48]     (...continued)
something that was out of control, you know, could it break into pieces with bolts flying here and there, that sort of question.

[49]     As the naval architect of the FAIRBANKS PROVIDER and its sister barges, Whalen was familiar with the design and capacity of portable couplers. He personally investigated the possibility of using portable couplers and made preliminary calculations on the load-bearing capacity of these devices. Even if he did not have personal
(continued...)

To the extent the passage minimally discusses why ARM did not build portable couplers, the testimony of witnesses Burdick, Williamson, and Whitney made the disputed passages in Whalen's testimony cumulative. Independent of Whalen's disputed testimony, there was ample compelling evidence that portable couplers were not feasible as stopping devices and would not have made the loading process safer. In this judge-tried case, we cannot say that admitting Whalen's brief, cumulative testimony was an abuse of discretion.

The reasons why a shipowner acted may be relevant to a negligence claim, and the court's finding that safety was a consideration in the decision not to include portable couplers was pertinent to Janes's alternative negligence claim. The superior court carefully distinguished between Janes's negligence claim and his unseaworthiness claim. It rejected the unseaworthiness claim not because it found that ARM had acted reasonably in abandoning the portable coupler idea, but because it concluded that Janes had not proved that the absence of portable couplers rendered the barge unseaworthy. The court decided the unseaworthiness claim based on the condition of the barge, not the conduct of ARM. There is consequently no indication the court relied on the disputed Whalen testimony in rejecting the unseaworthiness claim.

There was no error in admitting the disputed Whalen testimony into evidence, nor was its admission prejudicial.

V. **CONCLUSION**

For these reasons, we AFFIRM the judgment.

---

[49]     (...continued)
knowledge why ARM decided not to include portable couplers, he had knowledge relevant to the safety of portable couplers.